UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In Re:

    LINDA ANN MOORE and                                   Chapter 13
    DEE YANCEY MOORE, JR.,                              Case No.: 09-61990

                                                  *Debtors*.
_____

APPEARANCES:

PETER A. ORVILLE, P.C.                                 PETER A. ORVILLE, ESQ.
*Attorneys for Debtors*                                      ZACHARY McDONALD, ESQ.
30 Riverside Drive
Binghamton, New York 13905

STEVEN J. BAUM, P.C.                                    NATALIE A. GRIGG, ESQ.
*Attorneys for America's Servicing Company*
220 Northpointe Parkway, Suite G
Amherst, New York 14228

MARK W. SWIMELAR, ESQ.                     MAXSEN D. CHAMPION, ESQ.,
*Chapter 13 Standing Trustee*                       Of Counsel
250 South Clinton Street
Suite 203
Syracuse, New York 13202

Honorable Diane Davis, United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

       The question before the Court is whether Linda Ann Moore and her husband, Dee Yancey Moore, Jr., (collectively, "Debtors") may modify a mortgage that encumbers a single parcel of real property that consists of Debtors' personal residence and a stand-alone apartment building. Specifically, Debtors seek to "strip down"[1] the first mortgage lien held by America's

---

[1] This term "refers to the removal of a lien that secures the unsecured portion of an undersecured claim, as in cases in which the value of the collateral is only sufficient to cover part of the secured creditor's claim." 4-506 Collier on Bankr. ¶ 506.06 (MB) (citing *Talbert v. City Mortg. Servs. (In re Talbert)*, 344 F.3d 555, 556 n.1 (6th Cir. 2003)

Servicing Company as servicer for US Bank National Association, as Trustee for the Structured Asset Securities Corporation, Series 2005-AR1 ("ASC") on their real property located at 2619-2621 NY Route 26, situated in Maine, New York (the "Property").[2]

Adjudication of this matter turns on this Court's interpretation of 11 U.S.C. § 1322(b)(2), which permits a debtor to "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2) (2010).[3] Although this Court believes that the statutory text–commonly referred to as the anti-modification clause–has a plain meaning, as will be further discussed *infra*, "setting the boundaries of the 'home mortgage' exception to Section 1322(b)(2) has proven to be a remarkably difficult task." *In re Bulson*, 327 B.R. 830, 838 (Bankr. W.D. Mich. 2005); *accord* Veryl Victoria Miles, *The Bifurcation of Undersecured Residential Mortgages Under § 1322(b)(2) of the Bankruptcy Code: The Final Resolution*, 67 Am. Bankr. L.J. 207 (1993) (identifying this issue as "[o]ne of the most controversial and contested bankruptcy issues addressed by our courts and pondered by the bankruptcy bar in recent years"). After examination of the parties' submissions and arguments, the facts and circumstances of this case, and the relevant body of case law developing and applying varied standards under § 1322(b)(2), the Court concludes that modification in this case is permitted by the Code.

The following now constitute the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Civil Procedure 52, as incorporated by Federal Rule of Bankruptcy Procedure 7052.

---

(discussing concept of 'strip down'); *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 781 n.3 (4th Cir. 2001) (same)). This practice is also commonly referred to in the Chapter 13 context as a "cram down."

[2] Argent Mortgage Company, LLC ("Argent") was the original mortgagee of the loan acquired by ASC with respect to the Property.

[3] All further section references herein are to Title 11 of the United States Code (the "Code"), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which took effect on October 17, 2005.

## JURISDICTION

The Court has jurisdiction over the parties and this core matter pursuant to 28 U.S.C. §§ 157(a), (b)(1), (b)(2)(B), (K), and 1334(a).

## FACTS

The pertinent facts in this case are largely undisputed. The present controversy centers instead on the applicable standard of law. On July 20, 2010, the Court conducted an evidentiary hearing in this matter and heard testimony from two witnesses, Dee Yancey Moore, Jr. and Brenda Jashinsky, Bankruptcy Analyst for Wells Fargo Bank, N.A., the parent company of ASC (Transcript of Record at 29, ECF No. 51). The parties filed a post-hearing Stipulated Statement of Facts on July 23, 2010 ("Stipulation"). (ECF No. 41.) The following findings of fact are therefore derived from the parties' submissions, including, but not limited to, the Stipulation, admitted exhibits, and proffered testimony.

Debtors filed a voluntary Chapter 13 petition and accompanying schedules on July 17, 2009. (ECF No. 1.) On Schedules A and D, titled "Real Property" and "Creditors Holding Secured Claims," respectively, Debtors list and describe the Property as their personal residence, and they allege a market value for the Property of $56,000 as of the date of their bankruptcy filing. Debtors further list that the Property is subject to a secured claim in the amount of $166,736.70. Debtors' Chapter 13 Plan ("Plan"), filed on the same date as their petition for relief, initially sought to pay the secured creditor, ASC, $56,000 over the course of sixty months at an interest rate of 6% per annum, with ASC to receive 5% on the remaining amount of its claim in accordance with the general unsecured distribution set by the Plan. (ECF No. 2.) ASC filed a secured Proof of Claim, docketed as Claim Number 3, on August 17, 2009 ("Claim"), that asserts its claim to be fully secured in the amount of $188,638.99, which amount includes pre-

petition arrears in the amount of $40,749.61. ASC filed an Objection to Confirmation of Debtors' Plan on August 27, 2009 (ECF No. 12), alleging that Debtors' Plan improperly subjects its claim to valuation under § 506(a), and improperly bifurcates its claim in violation of § 1322. ASC therefore requested that confirmation be denied pursuant to § 1325. In response, Debtors filed an Amended Chapter 13 Plan on September 1, 2009 ("Amended Plan"), clarifying that the Property is one parcel consisting of two separate buildings, one of which is Debtors' residence and the other is a rental property. (ECF No. 13.) The Amended Plan does not alter the material terms of Debtors' treatment of ASC's Claim inside the bankruptcy case. Accordingly, ASC filed an Amended Objection to Confirmation on September 2, 2009, restating its original objections to bifurcation and cram down of its Claim and emphasizing that Debtors' Amended Plan fails to cure the deficiencies previously alleged by ASC. (ECF No. 15.)

The stipulated facts in this matter are as follows:

1. The Debtors executed a Note and Mortgage on March 2, 2005[,] in the amount of $175,500.00 secured by [the Property]. (Stip. ¶ 1.) (*See also* ASC's Ex. 4.)

2. The Property consists of one main lot that holds two separate structures. (Stip. ¶ 2.)

3. The Debtors maintain their primary residence in the structure designated 2621 Main Street . . . . (*Id.* ¶ 3.)

4. The second structure that is located on the parcel, . . . is designated as 2619 Main Street . . . . (*Id.* ¶ 4.)

5. The value of the entire [P]roperty, which contains both structures, is $64,600.00. (*Id.* ¶ 5.)

Mr. Moore testified that Debtors have owned the Property for approximately nineteen years, and that they have resided at 2619 Main Street and used 2621 Main Street as a rental property the entire time. (Tr. at 5.) In this regard, Debtors produced receipt booklets for tenants' rental

payments for various months beginning in August 1998 through May 2009, which were admitted into evidence without objection from ASC. (Debtors' Ex. A.) Debtors also offered and admitted into evidence their federal and state tax returns for the years 2003 (Debtors' Ex. B) and 2004 (Debtors' Ex. C). Debtors' returns reported losses from rental real estate in both years. (*Id.*)

Mr. Moore explained that he and his wife first learned of Argent when they decided to refinance their prior mortgage with Countrywide Financing. (Tr. at 6–7.) They received a telephone call from a telemarketer and, upon expressing an interest in obtaining a reduced interest rate, they received a follow-up telephone call from a broker. (*Id.* at 7.) Mr. Moore described the Property to the broker as consisting of "their home and the three rental units that were next door." (*Id.*) He testified that he disclosed the rental units because they had encountered problems with the Property's dual use when they had pursued other mortgages in the past. (*Id.* at 8.) At that time, the broker required tax returns, which Debtors provided for the 2003 and 2004 tax years. (*Id.*) As is customary, Debtors also provided Argent with proof of homeowners insurance in effect for 2621 Main Street. The broker advised Debtors that the rental property would need to be subdivided from the residential parcel prior to closing, but Debtors did not do so after learning that the cost would be approximately $400, which Debtors did not have at the time. (*Id.* at 10.)

In the Spring of 2005, an individual associated with either the brokerage or Argent traveled to Debtors' home to conduct the closing. (*Id.* at 11–12.) All documents, including the loan application documents, were signed by Debtors at the closing. Debtors signed a Uniform Residential Loan Application, which listed only 2621 Main Street and identified the Property as a one unit, primary residence. (ASC's Ex. 1.) The Application did not disclose any net rental income. (*Id.*) Debtors also signed an Occupancy Agreement stating that they intended to occupy

2621 Main Street as their primary residence. (ASC's Ex. 5.) As part of the Mortgage, Debtors were not required to sign a 1–4 Family Rider, and the Mortgage made no mention of 2619 Main Street. (ASC's Ex. 4.)

Ms. Jashinsky testified that it is standard practice in the mortgage industry for banks to rely upon information provided by the borrower during the mortgage application process, and Argent did so in this case. (Tr. at 31.) The bank generally relies on the information provided by the borrower to determine, for example, whether the subject property is to be used as a singular, primary residence, secondary residence, or as an investment property. (*Id.* at 32.) Ms. Jashinsky's testimony, however, was limited to industry standards because she had no personal knowledge of the facts and circumstances pertaining to Debtors' particular loan. From her experience and review of the documentation regarding the Property in issue, Ms. Jashinsky stated that she believed this loan was intended to cover a single family unit. (*Id.* at 36.) Notwithstanding the statements contained in the origination file, Ms. Jashinsky conceded that the description of the Property set forth in the mortgage document broadly encompassed the entire parcel, including the rental property. (*Id.* at 37–38.)

## ARGUMENTS

Summaries of the parties' arguments are drawn from ASC's Supplemental Affirmation in Support of Secured Creditor's Objection to Confirmation filed on January 28, 2010 ("ASC's Supplemental Affirmation") (ECF No. 21), ASC's Memorandum of Law filed on August 26, 2010 ("ASC's Memorandum") (ECF No. 53), and Debtors' Memorandum of Law filed on August 12, 2010 ("Debtors' Memorandum") (ECF No. 44). While the debtor bears the ultimate burden of persuasion to convince the court that the secured creditor's claim may be modified, *Beamon v. Litton Loan Servicing, LP (In re Beamon)*, Ch.13 Case No. 01-11162, Adv. No. 01-

90256, slip op. at 7 (Bankr. N.D.N.Y. Feb. 10, 2006), the secured creditor bears the initial burden of proof to show by a preponderance of the evidence that its claim falls within the anti-modification exception of § 1322(b)(2), *In re Perez*, 2010 Bankr. LEXIS 2320, at *8 (Bankr. S.D. Fla. July 14, 2010) (citing *In re Santiago*, 404 B.R. 564 (Bankr. S.D. Fla. 2009); *Jordan v. Greentree Consumer Disc. Co. (In re Jordan)*, 403 B.R. 339, 351 (Bankr. W.D. Pa. 2009) (citing cases). Accordingly, the Court will begin with ASC's position.

ASC contends that the Court, in making its ruling, must answer three preliminary questions to resolve the fundamental issue of whether its Mortgage securing Debtors' residence is subject to modification. First, ASC asks whether it is relevant that ASC subjectively believed that it was making a loan on residential real property to be occupied solely by Debtors as their personal residence at the time of the transaction. (ASC's Supplemental Affirmation at 2.) Second, ASC posits whether it is relevant that there are additional physical structures on the Property, notwithstanding that they are neither producing rental income nor inhabited or habitable. (*Id.*) Third, ASC asks whether the mortgage transaction date or the petition date controls. (*Id.*)

ASC contends that the first and second inquiries *are* relevant under the standards articulated in *Litton Loan Servicing, LP v. Beamon*, 298 B.R. 508 (N.D.N.Y. 2003), and *Brunson v. Wendover Funding (In re Brunson)*, 201 B.R. 351 (Bankr. W.D.N.Y. 1996), which it urges this Court to follow. (*Id.* at 3–4.) Although ASC does not explicitly argue that *Beamon* is binding precedent for the Utica Division of the United States Bankruptcy Court for the Northern District of New York, it requests that the undersigned adopt the holding of the Honorable Frederick J. Scullin, Jr., Former Chief United States District Judge, therein. (*See* ASC's Mem. of Law 4–5.) Thus, ASC argues that the applicable standard is the "*Brunson* approach," which

"calls for a case-by-case determination of whether the parties intended the mortgage in question to be primarily residential versus primarily commercial." *Beamon*, 298 B.R. at 512. Further, ASC states that the evidence in this case weighs in its favor with respect to each of the two cited *Brunson* factors, namely the parties' subjective intent in entering into the loan and the physical composition of the real property at issue. (ASC's Mem. of Law at 11.)

With respect to the third question advanced by ASC, ASC argues that although the Third Circuit's holding was erroneous in *Scarborough v. Chase Manhattan Mortg. Corp.*, 461 F.3d 406 (3d Cir. 2006), the Third Circuit correctly determined that the mortgage transaction date controls for purposes of § 1322(b)(2) (*id.* at 412). (ASC's Supplemental Affirmation at 5.) Specifically, ASC directs the Court's attention to Debtors' representations made on the Loan Application, including, but not limited to the stated purpose of the loan to refinance a single-family residence, the lack of disclosure of any rental income derived from the Property, and the lack of a 2-4 family rider (*id.* at 6), as well as the poor condition of the detached apartment building on the Property (*id.*). ASC avers that these facts collectively prevent modification of its Claim under the standard that it advances.

In sum, ASC contends that § 1322(b)(2) prevents modification of mortgages that are primarily residential in nature, as is the subject Mortgage in this case. (ASC's Mem. of Law 9.) Alternatively, should the Court reject the *Beamon* and *Brunson* holdings, ASC suggests that the Court should adopt the standard established in *In re Macaluso*, 254 B.R. 799 (Bankr. W.D.N.Y. 2000), wherein the Honorable Carl L. Bucki, United States Bankruptcy Judge, held that "[s]o long as the only collateral is a single parcel of real estate, it matters not that the parcel may fulfill many uses or be divided into many units" (*id.* at 800). Rather, the test under *Macaluso* is whether "the debtor principally resides in the real estate or some part thereof." (*Id.*)

Finally, even if the Court were to reject the temporal holding of *Scarborough*, to find the petition date to be the relevant point in time for determining whether a mortgage loan may be modified, ASC equitably contends that Debtors should not "get the windfall of modifying the [M]ortgage when [the second structure on the Property] . . . is uninhabitable and not producing any rental income." (ASC's Mem. of Law at 9.)

Debtors generally argue that the language of § 1322(b)(2) does not bar modification of a secured claim on multi-use property when some portion of the property constitutes the debtor's principal residence and the security interest held by the mortgagee covers that residence and also extends to other income-producing units or structures. (Debtors' Mem. of Law 1.) Debtors assert that the appropriate test under § 1322(b)(2) is a combination of the plain-language approach and the bright-line approach, or, alternatively stated, a combination of *Scarborough* and *Lomas Mortgage, Inc. v. Louis*, 82 F.3d 1 (1st Cir. 1996). (Debtors' Mem. of Law at 3.) Debtors urge this Court to reject the totality of the circumstances test articulated in *Brunson* and adopted in *Beamon* for the reason that the *Brunson* approach "will lead to a result inapposite to the Congressional intent behind § 1322(b)(2)." (*Id.* at 8.) Debtors agree with ASC that the critical time for determining whether a mortgage loan is subject to modification is the transaction date. (*Id.*) Here, because the Property contained Debtors' principal residence and a second structure that could have been, and in fact was, used as a rental property on the date of the transaction, Debtors' argue that the anti-modification language of § 1322(b)(2) is inapplicable to bar modification of ASC's Mortgage and lien. (*Id.* at 5.)

## DISCUSSION

Preliminarily, the Court must address the obvious question of whether *Beamon* is binding precedent upon the undersigned. *See, e.g., In re Lane*, 2010 Bankr. LEXIS 18 (Bankr. C.D. Ill.

Jan. 12, 2010) (examining divergent case law on the issue of whether a decision of a single district judge in a multi-judge district establishes binding precedent upon all bankruptcy judges within the district under the doctrine of *stare decisis*, and concluding that it does not because bankruptcy courts are "units" of the district court rather than inferior courts for purposes of this doctrine). While there is a split of authority on this issue, the majority view stemming from courts that have decided this issue over recent years is that a bankruptcy court is not bound by the decision of a single district court judge in a multi-judge district. *See* Paul Steven Singerman and Paul A. Avron, *Of Precedents and Bankruptcy Court Independence: Is a Bankruptcy Court Bound by a Decision of a Single District Court Judge in a Multi-judge District?*, 22 Am. Bankr. Inst. J. 1, at *1 (2003).

Most recently in the Northern District of New York, the Honorable Margaret Cangilos-Ruiz, United States Bankruptcy Judge, addressed this question in the case of *In re Ford*, 415 B.R. 51, 60–61 (Bankr. N.D.N.Y. 2009). After examining Second Circuit case law, Judge Cangilos-Ruiz therein concluded that the Syracuse Division was not bound by principles of *stare decisis*. *Id.* (quoting and discussing *In re Jamesway Corp.*, 235 B.R. 329 (Bankr. S.D.N.Y. 1999); *In re Phipps*, 217 B.R. 427 (Bankr. W.D.N.Y. 1998); *In re Bruno*, 356 B.R. 89 (Bankr. W.D.N.Y. 2006); *In re McBrearty*, 335 B.R. 513 (Bankr. E.D.N.Y. 2005)). Similarly, this Court is in agreement with the reasoning of the majority of courts that hold that the bankruptcy court is a "unit" of the district court, and thus is not bound by the decision of a single district court judge.

With the utmost respect for the district court bench in the Northern District of New York, whose decisions this Court finds to be persuasive, the undersigned believes that, where there is no clear Second Circuit precedent and where lower courts are vehemently split on a single issue, it is critical for the bankruptcy court to independently interpret the plain language of the Code in

furtherance of the development of bankruptcy law. While substantial deference will always be given to the rulings of each district court judge, and this Court will more often than not be in agreement with the same, parties to the judicial system benefit when the bankruptcy court's decision is firmly rooted in the Code and its evolution over the course of time rather than in principles of *stare decisis*. Accordingly, the Court respectfully declines to follow the holding of *Beamon* and favors the post-*Beamon* analysis of the Third Circuit in *Scarborough*.

As the parties' positions and reliance on divergent case law demonstrate, courts have engaged in a vigorous debate over the correct interpretation of § 1322(b)(2). More specifically, courts have struggled with the question of whether the anti-modification protection applies to a mortgagee whose debt is secured by property in addition to the debtor's home. The importance of § 1322(b)(2) and, by extension, the Court's application of the same, cannot be overstated. "It is through this provision that chapter 13 relief achieves great efficacy and substance. The debtor's ability to modify the terms of prepetition debts that have become too onerous to satisfy, as originally contracted, is an invaluable feature of debt adjustment under chapter 13." Miles, *supra*, at 217. Yet, Congress saw fit to afford special protection to lenders holding mortgages against only the debtor's home by prohibiting bifurcation of their claims under § 506(a),[4] thereby causing litigants and jurists to struggle with the questions of why and to what extent.

So much has been written about the scope of § 1322(b)(2) and what is meant by the language "other than a claim that is secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2) (2010). Courts have widely disagreed over the proper application of the anti-modification provision, yet each one proclaims that its

---

[4] Section 506(a) allows the debtor to limit a secured creditor's claim, as is determined thereunder, to the value of the underlying collateral. Any amount due the secured creditor in excess of the value of the collateral becomes unsecured. This is known as "bifurcation" of the debt. *First Nationwide Mortg. Corp. v. Kinney (In re Kinney)*, 2000 U.S. Dist. LEXIS 22313, *6 (citing *Lomas*, 82 F.3d at 2; *Ford Consumer Fin. Co. v. Maddaloni (In re Maddaloni)*, 225 B.R. 277, 279 (D. Conn. 1998)).

rule best comports with the "plain meaning," the legislative history, congressional intent, and/or the fundamental principles of bankruptcy law that mandate striking a balance between equity and fairness for the creditor and a "fresh start" for the debtor. *See* Miles, *supra*, at 207–08. These standards and their underpinnings need not be restated at length here. Rather, it is enough for this Court to set forth the competing and now well-known rules and, as it must, choose a side in the continuing debate so that it may apply its settled rule to the facts at hand.

Perhaps the most frequently cited cases by the bench and bar in the Second Circuit to date are *Lomas*, *Brunson*, *Macaluso*, *Beamon*, and *Scarborough*. Their respective holdings, decisive standards, and inconsistent rationale are chronologically stated as follows:

(1) "The antimodification provision of § 1322(b)(2) does not bar modification of a secured claim on a multi-unit property in which one of the units is the debtor's principal residence and the security interest extends to the other income-producing units," *Lomas*, 82 F.3d at 6 (relying upon the subsequent legislative history of § 1123(b)(5), added to the Code in 1994, the language of which tracked and is identical to § 1322(b)(2));

(2) "[E]ach case must turn upon the intention of the parties: Was home-ownership the predominant intention (and rental income simply a means to that end) or was investment income or the operation of a business the predominant purpose of the transaction?," *Brunson*, 201 B.R. at 353 (rejecting *Lomas* and interpreting the same legislative history of the 1994 legislation as requiring a case-by-case approach);

(3) "[T]he statute does not limit its application to property that is used *only* as a principal residence, but refers generally to any parcel of real property that the debtor uses for that purpose," *Macaluso*, 254 B.R. at 800 (emphasis in original), thus, "[s]o long as the only collateral is a single parcel of real estate, . . . [t]he statutory requirements are fulfilled whenever the debtor resides in that real estate or some part thereof," *id.* (finding no ambiguity in the statutory language and focusing on the placement of the word "only" as an adverb modifying "secured");

(4) "[T]he *Brunson* approach is most consistent with Congressional intent ['to encourage the flow of capital into the home lending market'], as it calls for a case-by-case determination of whether the parties intended the mortgage in question to be primarily residential versus primarily commercial in nature," *Beamon*, 298 B.R. at 512 (relying upon congressional intent and

> Congress' purpose in enacting § 1322(b)(2) to "buoy the residential real estate market"); and
>
> (5) "When a mortgagee takes an interest in real property that includes, by its nature at the time of transaction, income-producing rental property, the mortgage is also secured by property that is not the debtor's principal residence and the claim [therefore] may be modified in a debtor's later Chapter 13 proceeding," *Scarborough*, 461 F.3d at 412 (employing a literal and narrow reading of § 1322(b)(2)).

This Court has no hesitation adopting the post-*Beamon* reasoning and holding of *Scarborough* in its entirety, as its own reading of § 1322(b)(2) is most consistent with that of the Third Circuit.

> By using the word 'is' in the phrase 'real property' that *is* the debtor's principal residence,' Congress equated the terms 'real property' and 'principal residence.' Put differently, this use of 'is' means that the real property that secures the mortgage must *be only* the debtor's principal residence in order for the anti-modification provision to apply. We thus agree with the reasoning of the Bankruptcy Court for the District of Connecticut when it noted that § 1322(b)(2) 'protects claims secured only by a security interest in real property that *is* the debtor's principal residence, not real property that *includes* or *contains* the debtor's principal residence, and not real property *on which the debtor resides.*' [*Adebanjo v. Dime Sav. Bank, FSB*] *In re Adebanjo*, 165 B.R. 98, 104 (Bankr. D. Conn. 1994). A claim secured by real property that is, even in part, *not* the debtor's principal residence does not fall under the terms of § 1322(b)(2).

*Id.* at 411 (emphasis in original). The *Scarborough* court continued to state that its reading of § 1322(b)(2) turns on the plain language of the statute, making both legislative intent and the subjective intent of the parties irrelevant. *Id.*

This Court agrees that the statutory language of § 1322(b)(2) is clear and unambiguous. When that is the case, the Court's inquiry must begin and end with the plain language of the statute. *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989). "Had Congress intended the protections of § 1322(b)(2) to apply to property which serves as both the debtor's residence and as income-producing rental property, it would have employed words to effect that result." *In re Adebanjo*, 165 B.R. at 104. Congress has had occasion to do so, most recently with the passage of BAPCPA, and it opted to do nothing to the language of § 1322(b)(2) as originally

enacted. For these reasons, even if this Court were to consider congressional history, it would necessarily reject the often utilized argument that the controversial language was the inartfully drafted result of a quickly produced congressional compromise and it therefore must mean more than it plainly says. *See, e.g., Lomas*, 82 F.3d at 4 (finding the 'plain meaning' approach to § 1322(b)(2) to be inconclusive, as Congress could have simply meant to distinguish security interests in real property from security interests in personal or other property); *accord Brunson*, 201 B.R. at 352.

Thus, in the case of principal residence disputes under § 1322(b)(2), the decisive factors are solely "(1) whether the claim is secured only by real property, and (2) whether the real property is the debtor's principal residence." *Scarborough*, 461 F.3d at 411. In answering these questions, the relevant time period is necessarily when the creditor takes a security interest in the real property in question, and the Court must, therefore, "look to the character of the collateral at the time of the mortgage transaction." *Id.* at 412.

In the instant case, the Property has never been solely Debtor's principal residence within the meaning of § 1322(b)(2) because it has historically, and at the time of the mortgage transaction, included income-producing rental property. Argent became aware of the same during the underwriting process and Debtors' verified the same in the form of tax returns given to Argent prior to the closing date, yet Argent proceeded to closing notwithstanding the fact that Debtors failed to subdivide the Property. It is not enough for ASC to now rely upon documentation, the preparation of which was solely within Argent's control, to preserve its claim from modification. ASC does not, and cannot, dispute that the Property description contained within the loan documents includes both the address and physical tax map number for both the Debtors' personal residence and the separate apartment building. In addition, Debtors' rental

receipts span the years both before and after the transaction was consummated. Because Argent took a security interest in a single parcel of real property that included income-producing rental property in addition to Debtor's principal residence, ASC's claim may be modified.

## CONCLUSION

Based on the foregoing, it is hereby

ORDERED, that ASC's Amended Objection to Confirmation of Debtors' Amended Plan is hereby overruled; and it is further

ORDERED, that Debtors' case is restored to the Court's confirmation calendar scheduled to be held on December 2, 2010, at 10:30 a.m. in Binghamton, New York.

Dated at Utica, New York
this 18th day of November 2010

/s/ Diane Davis_____
DIANE DAVIS
United States Bankruptcy Judge